DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
Appellant, Otto Jones III, was indicted in Lorain County Common Pleas Court of two counts of aggravated drug trafficking in violation of R.C. 2925.03, one count of permitting drug abuse in violation of R.C. 2925.13, one count of drug abuse in violation of R.C. 2925.11, one count of possession of drug abuse paraphernalia in violation of R.C. 2925.14, and one count of possession of tools in violation of R.C. 2923.24. He was separately indicted on one count of intimidation in violation of R.C. 2921.03.[1] A jury found Jones guilty of all drug-related offenses. In total, Jones was sentenced to a term of confinement of 10 to 30 years. He has timely appealed from his conviction on the drug counts.
Jones has assigned as error that (1) the trial court failed to sentence him according to the sentencing statute that took effect July 1, 1996; (2) the trial court improperly permitted Jones to be tried jointly on both the drug and intimidation charges; and (3) the verdict was against the manifest weight of the evidence. We overrule all three assignments of error and affirm the judgment below.
 I
A summary of the testimony of the state's witnesses from the combined trial on all charges follows. A pregnant woman offered to become a confidential informant for Detective Edward M. Super II of the Lorain Police Department Narcotics Division, after being charged with a probation violation.[2] Detective Super agreed to use the woman as a confidential informant after she stated that she had a connection to Jones. She told Detective Super she had bought drugs from Jones on several occasions in the past. She also told Detective Super that her aunt, Katherine Stevens, and Jones had a daughter together, and that she believed they were living in the same apartment. In exchange for her cooperation the informant was permitted to start her probation period over, rather than being incarcerated.
Detective Super then organized a controlled buy between the informant and Jones.[3] The informant testified that on January 23, 1996, she telephoned Stevens with a request to buy cocaine. The conversation was recorded, as were the two buys. The audio tapes were played for the jury and admitted into evidence. Detective Super and another officer testified to the accuracy of the tapes. During the initial phone call, the following exchange can be heard:
Informant: Is Otto home?
Stevens: No, but I'm waiting on him now.
Informant: You're waitin' on him?
Stevens: Yeah, why?
 Informant: Um, cause I need something — Like an eight-ball.[4]
Stevens: All right.
 Informant: But I don't know what he wants for that. What's he charge for that.
Stevens: Two-fifty.
Stevens can also be heard on the tape telling the informant that she needs to be sure the informant is going to be there because "if I have him make that up[5] and you don't show he's gonna have a * * * fit." The informant arranged to visit Stevens' apartment later that day for the purchase.
The police gave the informant $200.00 in "buy money" to purchase cocaine and wired her with a transmitter. On the tape, once the informant is inside Stevens' apartment a series of impatient conversations between the informant and Stevens can be heard discussing when "he" will be there. On the tape, Stevens can be heard saying, "Tell him my niece is here and she's got that $200." The informant also testified that she heard Stevens making that comment to someone over the phone.
The informant testified that before Jones would "bring the dope in" she was required to give Stevens the money so that she could show the $200.00 to Jones. On the tapes, the following conversation can be heard:
 Stevens: As soon as I see him pull in, I want you to give me the money so I can run down in time `cause he won't give it (unintelligible).
 Informant: I want to see — I want to see what I'm buying first, `cause I (unintelligible).
* * *
Stevens: Give me the money quick.
* * *
 Stevens: If he don't see the money, he's not going to bring it up.
Shortly after this exchange is heard over the wire, surveillance police outside Stevens' apartment observed Jones entering the building. Stevens confirmed with the informant, in Jones' presence, that the informant had given her $200. The informant testified that Jones said, "Okay then." According to the informant, Jones and Stevens then moved into the apartment's bedroom. On the tapes, Stevens can be heard saying, "We ain't got a lot of time, Otto, because she's been waiting (unintelligible)." Also audible on the tapes is the informant saying, "How's that car run, Otto?" A faint male voice can be heard answering, "My car?"
According to the informant, Stevens emerged from the bedroom shortly thereafter with the cocaine and gave it to the informant. The conversation during which the drugs were apparently exchanged cannot be clearly heard on the tapes. Once outside, the informant surrendered the purchased cocaine to the police. No charges were brought against either Stevens or Jones at this time.
On April 13, 1996, the informant once again telephoned Stevens to request the purchase of cocaine.[6] This time the police gave the informant $500.00 in buy money to purchase the drugs. The recorded conversation to set up the buy again begins with the informant asking for Otto:
Informant: Anything goin' on over there?
Stevens: Yeah.
Informant: Um, Otto got that?
* * *
Informant: Um, I need a quarter ounce.
Stevens: No way — nope.
Informant: No way? — Damn.
Stevens: Do you got, do you got the money with you?
 Informant: Well — I — What I got is five hundred. Me and my girlfriend wanted to go in and —
 Stevens: Well, I'm sure that he'll give you that amount worth.
The informant's testimony was substantially the same.
The police then gave the informant the buy money and wired her with a transmitter. Later the same day the informant visited Stevens' apartment. As she entered the apartment the informant could see Jones cooking cocaine into crack cocaine on the kitchen stove. The informant then gave Stevens the $500.00 buy money. Stevens immediately handed the money to Jones in the presence of the informant. Stevens then asked the informant if she preferred her cocaine to be cooked into crack. The informant declined crack, purchased the cocaine, and left the apartment. None of these conversations are audible on the tape of the buy. The informant can be heard saying, "How you been Otto?" That comment was followed by what sounds like a male voice, although the words are unintelligible. On leaving, the informant immediately surrendered the purchased drugs to the awaiting police.
A short time after the informant left, the surveillance police observed Stevens and her daughter leaving the apartment. The police then arrested Stevens on a warrant arising out of the January 23, 1996 drug sale. More than $90.00 of the buy money from the April purchase was found on Stevens at this time.
Stevens offered to cooperate with police. Stevens had worked as a confidential informant for the arresting officers in the past. She agreed to tell Jones that she was picked up for shoplifting and that it was necessary for him to pick up their daughter. She also consented to a search of her apartment. Once Jones was out of the apartment, the consensual search ensued. The police found cocaine residue at several locations in the apartment, chemicals used to cut cocaine, a scale, and other drug paraphernalia. A money order for April 1996 rent, with "Otto Jones and Kathy Stevens" listed as the remitter, was also introduced into evidence.
On his way to pick up his daughter, Jones was stopped and arrested on the outstanding warrant from the January 23, 1996 drug sale. When he was arrested on the day of the second buy, Jones had $380.00 of the buy money from that day's transaction in his possession.
Stevens was the only witness for the defense. She testified that she received the drugs from a neighbor named Bob. Her account of the events indicated that Jones did not live with her, that he was not at her apartment on either occasion when the informant purchased the cocaine, that she led the informant to believe that Jones was providing the drugs, and that she did not tell Jones or the informant that the drugs were from a neighbor because she was embarrassed about her own addiction to cocaine. Stevens claimed that she gave Jones the money to prohibit her from spending the money before the rent for the apartment was paid. After a heated exchange with the prosecutor, Stevens stated she could not remember if Jones came in and out of the apartment on the days of the controlled buys.
 II A. Applicable Law
In his first assignment of error, Jones contends his sentencing should have been governed by Am.Sub.S.B. No. 2, which took effect on July 1, 1996. He argues, using statutory construction, that R.C. 1.58(B) entitles him to be sentenced according to the new sentencing guidelines even though his crimes were committed before July 1, 1996.
The Ohio Supreme Court specifically addressed the issue of the applicability of S.B. 2 in State v. Rush (1998), 83 Ohio St.3d 53, certiorari denied (1999), ___ U.S. ___, 143 L.Ed.2d 58. In Rush, the Court held that "the amended sentencing provisions of Am.Sub.S.B. No. 2 apply only to those crimes committed on or after July 1, 1996[,]" the effective date of S.B. 2. Id. at paragraph two of the syllabus. Jones was convicted of crimes that were committed before July 1, 1996. He was sentenced according to the statute that was in effect on the day he committed the crimes, even though his sentencing took place after the effective date of the new statute.
Rush also declined to apply R.C. 1.58(B) to sentencing for previously committed crimes, "Because the General Assembly has expressly stated that the amended sentencing provisions of S.B. 2 are applicable only to those crimes committed on or after its effective date, R.C. 1.58(B) is inapplicable." Rush,83 Ohio St. at 58. Under the doctrine of stare decisis, this court is compelled to follow the decision of the Supreme Court of Ohio. See McCail v. Administrator (1984), 21 Ohio App.3d 3, 4. Because Jones' crimes were committed before July 1, 1996, he is not entitled to be resentenced under the guidelines of S.B. 2. His first assignment of error is without merit and is overruled.
 B. Joinder of Offenses
In his second assignment of error, Jones claims the trial court erred when it granted the State's motion to consolidate the cases for trial. Specifically, Jones claims he was prejudiced by the consolidation of the cases because the jury heard evidence that would not have been admitted had the cases been separated.
Crim.R. 13 provides that "[t]he court may order two or more indictments or informations or both to be tried together, if the offenses or the defendants could have been joined in a single indictment or information." Because of this, Crim.R. 8(A), which governs joinder of offenses in indictments, must be examined. It states:
 Two or more offenses may be charged in the same indictment, information or complaint in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character, or are based in the same act or transaction, or are based on two acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct.
In one case in which a course of criminal conduct was alleged, the Supreme Court of Ohio noted that judicial economy is not served by severing or failing to join cases for which the evidence is inextricably intertwined. State v. Schiebel (1990),55 Ohio St.3d 71, 88, certiorari denied (1991), 499 U.S. 961,113 L.Ed.2d 649. When a trial court hears two cases in a single trial, over the objections of the defendant, the "defendant must demonstrate that the trial court abused its discretion" in refusing to sever the cases. State v. Lott (1990), 51 Ohio St.3d 160,163, certiorari denied (1990), 498 U.S. 1017,112 L.Ed.2d 596.
The offenses Jones was charged with involve a sequence of events connected together by the selling of drugs. The intimidation charge is based on the remarks Jones made to the informant to prevent her from testifying in the trial for his drug trafficking charges. The charge of intimidation would not have been present at all had Jones not been charged with drug trafficking. The informant is the same in each offense, would have been the key witness in both cases, and would have had to testify to the same events at two separate trials. The indictments in this case were properly joined at trial because the events were an interrelated series of events, the evidence for which was inextricably intertwined.
Even if the charges were improperly joined for trial, the trial court judgment will not be reversed unless prejudice results from the error. State v. Roberts (1980), 62 Ohio St.2d 170, 175, certiorari denied (1980), 449 U.S. 879, 66 L.Ed.2d 102. Jones claims consolidation of the drug trafficking charges and the intimidation charge was prejudicial and that the jury convicted him on the drug trafficking charges because they heard evidence of intimidation. In similar cases, other courts have noted that even if the underlying charge was not consolidated with the intimidation charge, testimony concerning the intimidation would be admissible at the trial for its relevance to establishing themens rea of the underlying offense. "[W]e note that evidence of threats or intimidation of witnesses reflects a consciousness of guilt and is admissible as admission by conduct." State v. Soke
(1995), 105 Ohio App.3d 226, 250, citing State v. Richey (1994),64 Ohio St.3d 353, 357. The charge of intimidation is not wholly independent of the charged offense. Id. Thus, because Jones was charged with intimidating the informant so that she would not testify at his drug trial the evidence supporting the intimidation charge would have been admissible against Jones at the trial on his drug offenses regardless of whether the cases were consolidated.
Trying the charges made in the two separate indictments together is consistent with Crim.R. 13, and with the general policy articulated by the Supreme Court of Ohio in Schiebel. In addition, Jones has not demonstrated that he was prejudiced by the consolidation of these cases. The decision by the trial court to consolidate the charges against Jones was not an abuse of discretion, and Jones' second assignment of error fails.
 C. Manifest Weight of the Evidence
The Ohio Supreme Court has noted that "[t]he discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the [judgment]." State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quoting State v. Martin (1983), 20 Ohio App.3d 172, 175. In determining whether this is one of those exceptional cases, we review the entire record, consider the credibility of the witnesses, weigh all the evidence, and make all reasonable inferences. Id. The jury's assessment of credibility of the witnesses will be given all due deference. State v. Fortson (May 6, 1998), Summit App. No. 18513, unreported, at 3. To sustain Jones' assignment of error this court must find, in resolving conflicts in the evidence, that the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. Thompkins,78 Ohio St. 3d at 387.
Jones contends the two convictions for drug trafficking were without basis because the convictions were against the manifest weight of the evidence. The Ohio Supreme Court has indicated that a defendant who offers to provide narcotics as a "link in the chain of supply" is guilty of "offering to sell" in violation of R.C. 2925.03. State v. Scott (1982), 69 Ohio St.2d 439, 441. In "link in the chain of supply" situations surrounding the sale of drugs, all links in the chain of supply are equally culpable.State v. Latina (1984), 13 Ohio App.3d 182, 187. The Latina
court added that "a person who knowingly transfers or offers to transfer narcotics is guilty of selling or offering to sell narcotics within the meaning of R.C. 2925.03." Id.
In order to establish that Jones committed the crime of drug trafficking, the state was required to prove, beyond a reasonable doubt, that Jones "knowingly s[old] or offer[ed] to sell a controlled substance." R.C. 2925.03. Jones claims this conviction is in error because it was Stevens, not he, who sold the informant the controlled substance. He states Stevens obtained the drugs from her neighbor, Bob. Jones contends he had no knowledge of cocaine, the informant was lying to further her own self-interest, and that Stevens had given him the $380.00 in buy money, which was found on him at his arrest, to pay her rent.
There is evidence in the record which, if believed, would establish beyond a reasonable doubt that Jones was a link in the chain of supply, thus establishing his culpability pursuant to R.C. 2925.03. The informant testified that Jones was present at both controlled buys. Detective Super and another police officer testified that they observed Jones enter the apartment building on January 23, 1996, and shortly thereafter heard Jones through the informant's transmitter. They also testified that they heard Jones through the informant's transmitter on April 13, 1996. On each of the tapes of the two controlled buys that were played for the jury, an adult male voice is heard responding to questions directed to "Otto."
The informant also testified that Jones ultimately had to approve the buy, because Stevens had to show Jones the money before the cocaine was given to the informant. On the tape of the first buy, a hurried exchange between the informant and Stevens when Jones arrived substantiates this testimony. The informant also testified that she witnessed Jones preparing crack cocaine in the kitchen of the apartment. When he was arrested, Jones had in his possession almost $400.00 of the buy money.
In contrast, Jones contends that Stevens' testimony is believable and supports his contention that he is innocent. Stevens first asserted that Jones was not present at either sale to the informant. Later on cross-examination, Stevens claimed she could not remember if Jones was present at the sales, but she did not dispute Detective Super's testimony. Stevens also claimed she could not recall the last name of the neighbor who supplied her with the cocaine to sell to the informant. At several times during the questioning of Stevens by the state, Stevens became agitated, and the court had to ask her to maintain her composure and to answer the questions directed to her.
In a jury trial, the resolution of conflicting testimony is a matter entrusted to the jury. After observing all the witnesses, listening to their differing testimony, and judging their credibility, the jury apparently did not believe Stevens. Its decision not to believe Stevens was reasonable. Stevens was in prison at the time she testified, as a result of several felony convictions. Jones was the father of her daughter, and her testimony on his behalf might keep one of her daughter's parents out of prison. In addition, Stevens has been convicted of drug use and has a persistent drug habit. She was clearly agitated while testifying, and changed her testimony at least once during the trial. Her testimony was inconsistent with the tapes of the buys, and with the testimony of both the informant and of the police. Because of this, it was not unreasonable for the jury to discount Stevens' credibility.
In contrast, the informant's testimony was internally consistent. It was corroborated by the testimony of Detective Super and it was confirmed in substantial part by the audio tapes of the buys. It was reasonable for the jury to believe that the testimony and tapes, combined with Jones' possession of the money that the police had provided for the purchase placed Jones in the chain which supplied drugs to the informant. If Jones was in the chain of supply he was culpable, whether or not there was a direct exchange of money for drugs between the informant and Jones. Based on our review of the entire record, the jury did not clearly lose its way when it concluded that Jones knowingly sold, or offered to sell, a controlled substance to the informant. Their decision was not against the manifest weight of the evidence, and Jones' third assignment of error is overruled.
 III
Jones' first assignment of error is overruled because it is contradicted by the recent decision of the Supreme Court of Ohio in Rush. Because the evidence that he attempted to intimidate potential witnesses for his drug offenses would have been directly admissible at his drug trial, it was not prejudicial to combine the two. Jones' second assignment of error is overruled. His third assignment of error is overruled because there was ample, credible testimony to support his conviction for the sale of drugs. The judgment of the trial court is affirmed.
Judgment affirmed.
 KK The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E).
Costs taxed to Appellant.
Exceptions.
WILLIAM R. BAIRD, FOR THE COURT
SLABY, J. and WHITMORE, J. CONCUR
[1] The conviction appealed from arises solely out of State v.Jones (Feb. 18, 1999), Lorain C.P. No. 96 CR048895, unreported. The drug counts contained in this case were heard simultaneously with the intimidation count contained in 96 CR049319. The resolution of the intimidation count retains it separate nature, despite the joint trial, and is not part of this appeal.
[2] The use of confidential informants in drug cases is a common practice in Lorain County. Confidential informants are generally given leniency in the charges brought and/or in sentencing in exchange for cooperation in catching drug dealers and drug users. The informant in this case had several prior convictions, and did not want to give birth to her child while incarcerated.
[3] A controlled buy occurs when the informant agrees to make a purchase of drugs under the supervision of the police department. Supervision ordinarily includes the informant wearing a transmitter and the police taping the conversation as the deal occurs. The informant is given "buy money" with which to purchase the drugs. The serial numbers of the "buy money" are photocopied by the police department. The informant is searched prior to the purchase. After the purchase, the informant gives awaiting police officers the purchased drugs.
[4] Officer Christopher Pittak testified that the phrase eight ball refers to an eighth of an ounce of cocaine.
[5] The informant later testified that the phrase "making it up" refers to the practice of measuring and cutting cocaine as well as cooking cocaine into crack cocaine.
[6] Typically, the buys are relatively close in time to each other. In this instance, it was necessary to wait until April 1996 for the next buy due to the informant's complicated pregnancy and the birth of her child.